UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MARK ALLAN KEELER,

　　　　　　Plaintiff,

　　v.

ANDREW SAUL,[1] Commissioner of
Social Security,

　　　　　　Defendant.

No. 1:18-cv-00283-GSA

**ORDER REMANDING CASE FOR
FURTHER PROCEEDINGS UNDER
SENTENCE 4 OF 42 U.S.C. § 506(g)**

## I.　　Introduction

Plaintiff Mark Allan Keeler ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[2] *See* Docs. 20, 21 and 22. Having reviewed the record as a whole, the Court finds that certain of the ALJ's findings were contrary to substantial evidence in the record and that the ALJ failed to develop the record to resolve ambiguous evidence and supplement incomplete documentation. Accordingly, the Court reverses

---

[1] Commissioner of Social Security Andrew Saul is substituted as Defendant pursuant to Fed. R. Civ. P. 25(d). *See also* Section 205(g) of the Social Security Act, 42 USC 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).
[2] The parties consented to the jurisdiction of the United States Magistrate Judge. *See* Docs. 10 and 13.

1

the Commissioner's denial of benefits to Plaintiff and remands this matter to the Commissioner for further proceedings consistent with this order.

## II. Procedural Background

On February 6, 2014, Plaintiff filed an application for disability insurance benefits alleging disability beginning April 5, 2013. AR 16. The Commissioner denied the application initially on June 12, 2014, and upon reconsideration on November 6, 2014. AR 16. On January 11, 2015, Plaintiff filed a timely request for a hearing before an Administrative Law Judge. AR 16.

Administrative Law Judge Vincent A. Misenti presided over an administrative hearing on September 14, 2016. AR 34-55. Plaintiff appeared without representation. AR 34. Impartial vocational expert Alan Boroskin (the "VE") also testified. AR 34.

On December 23, 2016, the ALJ denied Plaintiff's application. AR 16-28. The Appeals Council denied review on December 21, 2017. AR 1-4. On February 26, 2018, Plaintiff filed a complaint in this Court. Doc. 1.

## III. Factual Background

### A. Plaintiff's Testimony

Plaintiff (born November 20, 1962) lived with his nineteen-year-old son. AR 41. His income consisted of disabled veteran benefits totaling $263.00 or $267.00 a month and about $110.00 in food stamps. AR 41, 49. Plaintiff completed high school and was able to drive. AR 41.

Diagnosed with bipolar disorder, Plaintiff had good days and days in which he was unable to function. AR 42. He was troubled with anger and indecision. AR 42-43. He was no longer able to understand what he was reading leading to problems such as his inability to follow the directions for reading the computer discs of the administrative record, which had been sent to him before the hearing. AR 42. None of the medications that Plaintiff had tried worked for him. AR 46.

As a result of a 1985 motorcycle accident, Plaintiff was missing part of his right leg. AR 44-45. Unable to describe the injury, Plaintiff lifted his right pants leg to show the ALJ the

2

condition of his right lower extremity.[3]  AR 45.  The injury left him unbalanced, causing pain and further injury to his ankle and knee joints.  AR 45.  Plaintiff recently began using a walker which enabled him to straighten his body while he walked.  AR 45, 49.  Plaintiff thought he could walk for about fifteen or twenty minutes before he would need to sit down for fifteen or twenty minutes.  AR 49.

Just prior to the hearing, Plaintiff had spent 51 days in the hospital with uncontrollable vomiting.  AR 46-47.  Plaintiff's doctors did not identify a cause but Plaintiff attributed the vomiting to stress and anxiety.  AR 46.

Each of Plaintiff's days was different.  AR 47.  He tried to garden, made sandwiches and tried to keep the house tidy.  AR 47-48.  Plaintiff's son mowed the lawn, vacuumed and took out the trash.  AR 48.

Prior to the hearing, Plaintiff completed an adult function report.  AR 180-87.  He reported feeling sad and depressed and expressed lack of motivation to do house and yard work.  AR 181-82.  He had difficulty standing, sitting, remembering, completing tasks, concentrating, understanding, following instructions and getting along with others.  AR 185.  Plaintiff thought he did not get along well with authority figures, did not handle stress well, and declared, "Change is not good."  AR 186.

## B.    Third-Party Reports

On March 18, 2014, the agency filing officer observed that Plaintiff had difficulty concentrating, answering, and being coherent.  AR 146.  The officer noted," [Claimant] very polite, seemed a little confused about things, grooming fair."  AR 146.

Plaintiff's mother, Pamela Keeler, prepared a third-party adult function report.  AR 170-77.  She spent time gardening and eating lunch with Plaintiff but had limited knowledge of how Plaintiff functioned in day-to-day activities.  AR 170.  Because of injuries incurred in a motorcycle accident, Plaintiff had difficulty walking, standing and kneeling.  AR 175.  He had additional difficulties with memory, concentration, following instructions, taking tests and filling

---

[3] The ALJ did not describe on the record what he was able to observe of the condition of Plaintiff's right lower extremity.  Instead, he declined to consider Plaintiff's leg impairment for lack of medical corroboration in the record.  AR 44.

out forms such as job applications.  AR 175.  Plaintiff generally got along well with authority figures and co-workers, but had been fired from his job after problems with a new supervisor.  AR 176.  Plaintiff was "paranoid" and did not handle stress or changes in routine well.  AR 176.  He could become frustrated and upset with people, but was not violent.  AR 177.

In a separate letter to the agency, Ms. Keeler explained that Plaintiff had mental problems most of his life.  AR 206.  He did not do well at school because he was unable to write things down on paper and could not seem to comprehend things very well.  AR 206.   He also had an anger problem, which had improved with therapy.  AR 206.  After losing part of his leg in a motorcycle accident, Plaintiff had difficulty standing and experienced chronic pain.  AR 206.  His physical problems were worsening as he aged.  AR 206.

## C.   Medical Records

Plaintiff was a long-time patient at the Veterans Administration Central California Health Care Service (VA).[4]  Plaintiff's service connected/rated disabilities totaled 20 percent: tinnitus, 10 percent; eczema, 10 percent; and loss of motion—little or ring finger, 0 percent.  AR 290.

The medical portion of the record is almost entirely composed of the VA's treatment records for Plaintiff during the period relevant to the pending disability application, and also includes Plaintiff's medical history and some records of earlier treatment.  Plaintiff's chronic medical problems included diabetes with renal manifestations (chronic kidney disease) and mild nonproliferative diabetic retinopathy; hypertension; hyperglyceridemia; right shoulder joint pain; multiple gastrointestinal problems; chronic pain; hypothyroidism; and, allergies with rhinitis and sinusitis.  AR 234-45, 315, 514.  He also had chronic mental health problems including depression and bipolar disorder.  AR 242-43.

Plaintiff was diagnosed with diabetes on November 2001.  AR 378.  During the time period relevant to this application, Plaintiff's blood glucose and A1C[5] levels were consistently

---

[4] Plaintiff served in the U.S. Army from February 23, 1982 through October 14, 1983, and from June 24, 1981 through October 16, 1981.  AR 497.  Plaintiff was honorably discharged at the end of each stint.  AR 497.

[5] A1C is a blood test for type 2 diabetes and prediabetes.  Because the test measures the patient's average blood glucose level over the past three months, it indicates how well the patient is managing his or her diabetes.  The A1C level is a percentage.  Normal readings are 5.7 percent or below.  Prediabetes is 5.7 to 6.4 percent.  Type 2 diabetes is above 6.5 percent.  The goal for diabetic patients is to maintain an A1C percentage below 7 percent.  www.medlineplus.gov/a1c.html (accessed September 11, 2019).

very high.  Normal blood glucose levels (fingerstick testing) range from 70 mg/dl (low) to 110 mg/dl (high).  AR 263.  The record reflects the following blood glucose levels measured during examinations at the VA: 230, April 19, 1013; 288, May 18, 2013; 175, August 29, 2013; 321, January 30, 2014 (10:30[6]); 313, January 30, 2014 (11:58); 334, February 5, 2014; 385, February 25, 2014; 380, April 4, 2014 (9:14); 336, April 4, 2014 (10:41); 426, July 15, 2014; 133, June 16, 2016 (7:30); 232, June 16, 2015; and, 348, June 27, 2016.  AR 250, 252, 263, 331, 423, 647, 779.  A1C levels were: 9.2, April 19, 2013; 11.1, August 29, 2013; 10.3, January 30, 2014; 10.1, February 25, 2014; 9.7, June 16, 2015; and, 9.7, March 23, 2016.  AR 261, 364, 444, 647, 671.

On June 17, 2015, Plaintiff's primary care physician, Shabana Moins, M.D., characterized Plaintiff's diabetes as uncontrolled and increased his prescription for glipizide.[7]  AR 889.  Because Plaintiff was unable to use the lancet to draw blood, he did not test his blood glucose levels at home.  AR 331.

Beginning in August 2013, Plaintiff began to use marijuana habitually, maintaining that it improved his symptoms more than prescribed medications.  AR 313.

On multiple occasions, medical personnel treating Plaintiff in a clinic or the emergency department sought a psychiatric consultation when Plaintiff appeared unduly depressed and tearful, suicidal or homicidal.  AR 290-91.  In January 2014, a dietician brought Plaintiff to the suicide prevention case worker after Plaintiff voiced suicidal ideation in the course of a weight management and diabetes consultation.  AR 333-34, 337-40.  Plaintiff told psychiatry resident Sabeena Acharya that he heard a voice telling him to kill himself by driving off the road or freezing to death.  AR 338.  Plaintiff stated that he would not act on his suicidal thoughts for the sake of his son.[8]  AR 338.  Plaintiff was open to mental health care and agreed to try a prescription of Geodon (Ziprasidone).[9]  AR 339.

---

[6] All times indicated are military time.
[7] Glipizide is a sulfonylurea which lowers blood glucose by stimulating the pancreas to produce more insulin and helping the body use insulin more efficiently.  www.medlineplus.gov/druginfo/meds/a684060.html (accessed September 11, 2019.
[8] Plaintiff's wife abandoned the family in or about 2010.  AR 619.  Thereafter, Plaintiff was solely responsible for his son.
[9] Geodon (Ziprasidone) is an atypical antipsychotic medication used to relieve the symptoms of schizophrenia and manic or mixed episodes of bipolar disorder.  https://www.medlineplus.gov/druginfo/meds/a699062.html (accessed August 28, 2019).

In November 2013, audiologist Kathy Lowe, Au.D., conducted an audiologic evaluation to determine Plaintiff's hearing loss or tinnitus. AR 550-560. Dr. Lowe reported that Plaintiff had normal hearing in both ears. AR 555. Since June 1983, however, Plaintiff's exposure to the sound of jets landing and taking off resulted in a constant ringing (tinnitus) in Plaintiff's ears. AR 558. Dr. Lowe opined that the probability that Plaintiff's tinnitus resulted from Plaintiff's exposure to aircraft noise while working the flight line during active service was greater than 50 per cent. AR 559. Plaintiff's tinnitus affected his daily life and ability to work in that it caused sensitivity to any loud noise including the music at church or the sound of truck air brakes. AR 559.

In February 2014, Plaintiff told psychiatric nurse practitioner Gilbert D'Souza that he had experienced thoughts of self-harm since he was sixteen years old. AR 329. In recent years he heard voices telling him to kill himself but he resisted because he needed to raise his son. AR 329. In March 2014, Plaintiff reported experiencing depressive symptoms (describing himself as a "failure") and panic attacks with few manic symptoms other than a single impulsive act. AR 313. Clinical psychiatrist Avak Howsepian, M.D., noted that Plaintiff was chronically suicidal and presently had a plan but no intent. AR 315.

In April 2014, Plaintiff sought assistance for an inability to sleep more than three or four hours per night. AR 304-05. He described an inability to quiet his mind which he distinguished from his typical manic symptoms. AR 305.

On July 15, 2014, Plaintiff was held in the VA Hospital overnight after expressing suicidal thoughts to his primary physician in the mental health clinic. AR 432-35, 457-507. Psychiatrist Joanna Gedzior, M.D., noted that although Plaintiff had detailed multiple plans of suicidal intent in the mental health clinic, he minimized his suicidal thoughts in the emergency department because he did not want to be admitted to the hospital. AR 433. Plaintiff was disappointed and angry that he was admitted but was calmer and more euthymic the following

///

day.  AR 433-34.  Dr. Gedzior increased Plaintiff's dosage of Geodon.  AR 434.  Plaintiff's

discharge diagnosis was:

     1.     Unspecified bipolar disorder by history, rule out components from substance induced mood disorder (cannabis).
     2.     Cannabis use disorder (dependence).
     3.     Rule out psychotic spectrum illness.
     4.     Rule out intellectual disability.
     5.     VCODE isolation, unemployment, few supports, medication noncompliance.
     6.     Diabetes mellitus, hypertension, hyperlipidemia.
     7.     Global assessment of functioning 7.
     8.     Strengths:
          1.     He has a son.
          2.     He has a place to live, no debt, makes $200.00 a month in service connection.

AR 432-33.

At the follow-up appointment on July 30, 2014, Plaintiff reported that he was feeling good

and taking his medications.  AR 440.  Plaintiff continued to use marijuana to relieve his anxiety.

AR 440.

In January 2015, Plaintiff began individual therapy sessions at Alpha Behavioral

Counseling Center.  AR 536.  Cathy Stansell, LMFT, noted that Plaintiff's diagnoses included

bipolar disorder I (296.54), depressed with psychotic features.  AR 536.  In a letter addressed "to

whom it may concern," Ms. Stansell wrote:

> [Plaintiff] reports that he has difficulty going to sleep and often wakes up in the middle of the night.  [Plaintiff] often becomes angry and aggravated.  He is easily distracted and often has trouble focusing.  [Plaintiff] often hears voices on a daily basis.  Sometimes [Plaintiff] has racing thoughts and talks excessively.  [Plaintiff] has expressed suicidal thoughts and not wanting to live on many occasions.

AR 536.

June 2015 x-rays of Plaintiff's chronically painful right shoulder indicated moderate

degenerative changes throughout with loss of articular cartilage and mild degenerative changes to

the right a.c. joint.  AR 637.  There were no bony lesions or evidence of calcific tendinitis.  AR

637. X-rays of Plaintiff's feet showed no significant abnormalities and mild degenerative

changes.  AR 638-39.

In August 2015, podiatric consultant Ross M. Nishijima, D.P.M., examined Plaintiff, who had reported toe pain and burning of his feet. AR 539-40. Neurological testing did not elicit a protective response from the toes of either foot. AR 540. Dr. Nishijima observed a steppage gait[10] and diagnosed bilateral hammertoes, hallux vagas (bunions) and diabetic neuropathy. AR 540.

In September 2015, podiatric surgeon Benjamin A. Brownell, D.P.M., noted diminished muscle strength in the right anterior muscle group and described Plaintiff's right foot as "inverted on the leg." AR 538. Plaintiff also had high arches, hammertoes and bunion deformities on both feet. AR 538. Because of severe scarring of his right leg, Plaintiff could not use an ankle foot orthosis (AFO) to stabilize the foot drop of his right lower extremity. AR 538.

In February 2016, Dr. Brownell requested a mental health appointment in the context of considering a possible amputation of Plaintiff's right leg below the knee. AR 654-55. Dr. Brownell noted that Plaintiff had significant nerve, blood flow and muscle damage as a result of his motorcycle accident and the 1985 decision to save his leg. AR 689. Noting that Plaintiff had long struggled with pain and limited motion, Dr. Brownell opined that an amputation would relieve Plaintiff's pain and improve his mobility and quality of life. AR 654-55. However, Dr. Brownell thought counselling was imperative before a final decision and suggested Dr. McClelland, who worked with patients at the amputee clinic. AR 654-55.

In June 2016, primary care physician Shabana Moins noted atrophied right lower leg muscles but full range of motion. AR 719. Range of shoulder motion was normal except that abduction was limited to ninety degrees. AR 718.

Plaintiff was hospitalized from July 20 through August 31, 2016, for "vomiting due to esophagitis." AR 732. Discharge diagnoses were esophagitis, hypothyroidism, diabetes, high cholesterol, enlarged prostate, bipolar disorder, high blood pressure and cannabis dependency.

///

---

[10] "Steppage gait (high stepping) is an abnormal gait pattern that arises from weakness of the pretibial and peroneal muscles due to lower motor neuron lesion. Affected patients have foot drop and are unable to dorsiflex and evert the foot. The leg is lifted high on walking so that the toes clear the ground, and there may be a slapping noise when the foot strikes the ground again." www.ncbi.nlm.nih.gov/gtr/conditions/C0427149/ (accessed September 12, 2019).

AR 732.  During his stay, Plaintiff received physical therapy to improve his strength and ability to walk.  AR 732.  Doctors also prescribed insulin.  AR 735.

### D.   Medical Opinions[11]

#### 1.   Agency Psychologists

Psychologist Hillary Weiss, Ph.D., noted that Plaintiff was receiving mental health treatment that included prescription drug therapy but no hospitalization or extended periods of decompensation.  AR 60.  Symptoms varied over time and included depression, anxiety, mild suicidal and homicidal ideation, insomnia, blunted affect and slowed speech.  AR 60.  Plaintiff was repeatedly compliant with medications until he felt better and stopped taking his prescribed drugs.  AR 60.  He was polysubstance dependent and used cannabis daily, which he reported successfully relieved his depression.  AR 60.  Dr. Weiss opined that Plaintiff was no more than moderately functionally impaired because he continued to live independently and care for his teen-aged son despite having gone for eight years without prescribed medication.  AR 60.

Dr. Weiss opined that Plaintiff had mild restriction of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence and pace; and, no repeated episodes of decompensation of extended duration.  AR 62. He had no significant limitations in his ability to carry out short and simple or detailed instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination or proximity to others without being distracted buy them; make simple work-related decisions; ask simple questions or request assistance; accept instruction and respond appropriately to criticism from supervisors; get along with coworkers or peer without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel to unfamiliar locations or use public transportation; and, set realistic goals or make plans independently of others.  AR 64-65.  Plaintiff had moderate limitations in the following: maintaining attention and concentration for extended periods; completing a normal

---

[11] The opinion of Plaintiff's treating physician, Karthik Sethuram, M.D., is included in section X *infra*.

workday and workweek without interruptions from psychologically based symptoms; performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; and, responding appropriately to changes in the work setting. AR 64-65. On reconsideration, Elizabeth Covey, Ph.D.,[12] agreed with Dr. Weiss's opinion. AR 76-79.

### 2. Agency Physicians

Maria M. Rehrig, M.D., opined that Plaintiff was not severely impaired physically. AR 60. His diabetes, hypercholesterolemia and hypertension were managed with prescription medications and did not impact function. AR 60. Plaintiff had trouble standing and sitting but was able to perform activities of daily living. AR 60. Dr. Rehrig did not address the condition of Plaintiff's right foot and lower leg.

On reconsideration, I. Ocrant, M.D., considered Plaintiff's medical condition without comment. AR 75. Dr. Ocrant found Plaintiff's diabetes and hypertension to be nonsevere. AR 75.

### 3. Vocational Management Services

In July 2014, psychologists Patrick Tackett, M.A., and Howard Glidden, Ph.D., of Vocational Management Services (VMS) tested Plaintiff to determine whether he had a learning disability.[13] AR 398-404. Plaintiff reported that he had received special education services until his family moved to Laton where the school district did not offer special education. AR 401. Intelligence testing (WAIS-IV) indicated that Plaintiff had a full scale IQ score of 84 (low average), average verbal comprehension and perceptual reasoning, low average working memory and extremely low processing speed. AR 398-99. Mr. Tackett opined that the disparity in Plaintiff's scores indicated a learning disorder. AR 400. Mr. Tackett recommended that Plaintiff engage in various activities to improve his reading, writing and perceptual skills; attend cognitive skills training sessions and adult basic education classes; and, be referred to a counselor to

///

---

[12] The hearing decision referred to Dr. Covey as Dr. "Covery."

[13] Although the VMS reports appear within the VA records in the administrative record, the relationship of VMS to the VA, if any, is not explained in the record.

address the after effects of Plaintiff's having been fired from his prior job. AR 401-02. He also suggested vocational skills training to enable Plaintiff to become a bus driver. AR 401.

### 4. Dr. White

In March 2016, psychologist Thomas White, Ph.D., conducted the pre-surgical counseling requested by Dr. Brownell prior to making a decision on the proposed amputation of Plaintiff's lower right leg. AR 682-84.

Dr. White noted that Plaintiff sustained significant leg damage in a hit-and-run motorcycle accident in November 1985. AR 682. Treatment of his injuries was delayed by a transfer from the original emergency room to another hospital where Plaintiff's fibula was removed among other procedures. AR 682. In 2016, Plaintiff experienced chronic pain and had significant scar tissue that bled easily. AR 682. Dr. White wrote:

> Veteran wishes he had woken up to an amputated leg back in 1985. He reports he has previously withheld consent for a below-the-knee amputation (BKA) because he hasn't trusted the VA. He thinks he might be able to trust the VA now. Veteran worries that he will be "hung out to dry" with insufficient physical/occupational therapy subsequent to surgery. He states that he is unaware what the recommended post-surgical routine is. He is unaware of how long his recovery will be. He worries he will never drive again. He worries he will not be provided a prosthetic leg and he can't afford to buy one himself.

AR 682-83.

Dr. White administered the Montreal Cognitive Assessment (MoCA). AR 683. Plaintiff scored below the normal range. AR 683. Dr. White wrote:

> Veteran failed the Necker Cube, needed prompting on Digits Backward, got flummoxed on Fluency, was 1 for 2 on Abstraction, and 2 for 5 on Delayed Recall. These results suggest mild cognitive deficits typical of Borderline Intellectual Functioning. Veteran reported historical diagnosis of Learning Disorder. Further assessment would be required for more specific diagnosis of cognitive/intellectual functioning.

AR 683.

The doctor described Plaintiff as anxious, concerned and displaying expansive affect and simple, profuse speech. AR 683. Grooming was minimally acceptable. AR 683. Plaintiff was fully oriented and absent of delusion. AR 683. Insight was poor, and judgment and impulse

control were poor to fair. AR 683. Dr. White diagnosed borderline intellectual functioning, bipolar disorder and unspecified anxiety disorder, and emphasized Plaintiff's poor problem-solving skills. AR 684. He opined:

> Veteran has a diagnosis of Bipolar Disorder and Screener (MoCA) results suggest that he would likely meet criteria for Borderline Intellectual Functioning.
>
> Veteran has a hard time thinking outside the box. His thought patterns are rigid. He worries greatly about the unforeseen outcomes of events, which has been reinforced by his history of poor advocacy and terrible results.
>
> Veteran's anxiety will be significantly less if he is given simple, written instructions for what to expect in surgery, outcomes of surgery, and especially the timeline for recovery. He may benefit from regular visits with a provider (who could be this writer) who will discuss his feelings and needs and help address concerns as they arise.

AR 684.

## IV. Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's

decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. **The Disability Standard**

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f).

## VI. **Summary of the ALJ's Decision**

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of April 5, 2013. AR 18. His severe impairments included arthritis; diabetes mellitus with neuropathy; affective disorder; and anxiety disorder. AR 18. None of the severe

///

impairments met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d); 404.1525; 404.1526).  AR 19.

The ALJ concluded that Plaintiff had the residual functional capacity to perform medium work as defined in 20 C.F.R. § 404.1567(c) "except frequent right reaching; understanding, remembering and carrying out simple routine repetitive tasks using judgment limited to simple work related decisions; and socially interacting with coworkers and the public occasionally."  AR 21.

Plaintiff was unable to perform any past relevant work.  AR 26.  Considering Plaintiff's age, education, work experience and residual functional capacity, jobs that Plaintiff could perform existed in significant numbers in the national economy.  AR 27.

### VII.  Plaintiff's Proceeding Without Counsel or Other Representation[14]

In a preface to his arguments, Plaintiff contends that the ALJ had a "heightened duty of care" to ensure that Plaintiff had a full and fair opportunity to present his claim.  Doc. 20 at 13. The Commissioner did not comment on Plaintiff's contention.

A claimant generally bears the burden of proving his or her entitlement to disability benefits.  *Mayes v. Massanari*, 276 F.3d 453, 459 (9th Cir. 2001); 20 C.F.R. § 404.1512(c). However, Social Security hearings are not adversarial proceedings.  *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991).  Whether or not the claimant is represented by counsel, the ALJ "must inform himself about the facts relevant to his decision."  *Heckler v. Campbell*, 461 U.S. 458, 471 n. 1 (1983).  "The ALJ has a special duty to fully and fairly develop the record and to assure that the client's interests are considered."  *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983).  *Accord Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Smolen*, 80 F.3d at

---

[14] Courts generally do not address issues not raised by the parties on appeal.  F.R.App.P. 28(a); *Crawford v. Gould*, 56 F.3d 1162, 1169 (9th Cir. 1995).  Nonetheless, a court may raise an issue *sua sponte* to prevent injustice, *Morales v. Astrue*, 2010 WL 2629571 at *8 (C.D.Cal. June 29, 2010) (No. CV 09-2494-PJW), or to raise an affirmative defense not raised by the defendant, *Tahoe-Sierra Preservation Council, Inc., v. Tahoe Regional Planning Agency*, 216 F.3d 764, 788-89 (9th Cir. 2000), overruled on other grounds, *Gonzales v. Arizona*, 677 F.3d 383, 389 n. 4 (9th Cir. 2012).  *Moore v. Astrue*, 2011 WL 1532407 at *3 (D. Mont. Mar. 30, 2011) (No. CV-10-36-GF-SEH-RKS). Fully addressing Plaintiff's arguments on appeal required the Court to reorganize Plaintiff's issues and Defendant's responses to permit complete and orderly analysis of how the proceedings below complied, or failed to comply, with regulatory requirements, and to articulate completely and accurately the matters to be addressed on remand.

14

1288.  The duty is triggered whenever the evidence is ambiguous or the record is inadequate to
allow proper evaluation of the evidence.  *Mayes*, 276 F.3d at 459-60.

Because mentally ill or intellectually impaired claimants may not be able to protect
themselves from possible loss of benefits by furnishing necessary evidence of their limitations,
the ALJ's duty to develop the record fully is "especially important" in such cases.  *DeLorme*, 924
F.2d at 849.  The record here establishes that Plaintiff was both mentally ill and intellectually
impaired requiring the ALJ to take extra care to ensure that the record was adequate to set forth
Plaintiff's impairments and functional limitations fully and fairly.

The Court finds that Plaintiff's interests were not safeguarded the absence of an attorney
or other advocate. For instance, the ALJ failed to consider Plaintiff's testimony of impairments
associated with his lower right extremity based on the absence of medical documentation in the
record.  AR 44.  Given the record's many references to impairments associated with the lasting
effects of the 1985 injuries to Plaintiff's lower right extremity, medical documentation more
properly would have been considered incomplete, requiring the ALJ to supplement the record.

Likewise, the ALJ did not follow up on Plaintiff's testimony that he was "kicked out" of
the Welfare to Work program (AR 50), evidence that may have been highly relevant to Plaintiff's
ability to function in a work environment during the time period relevant to this application.

Had an attorney or other advocate been present on Plaintiff's behalf, he or she likely
would have provided evidence of Plaintiff's lower right leg impairment and/or "made a record" of
the appearance of Plaintiff's lower right leg when Plaintiff, unable to describe the permanent
deformity that resulted from his 1985 motorcycle accident, rolled up his pants leg to allow the
ALJ to see its condition.  AR 45.  The ALJ did neither.  Ultimately, the ALJ relied only on the x-
rays of Plaintiff's *feet* (AR 638-39) to declare Plaintiff's *right lower extremity* had minimal
degenerative changes.  AR 18.  The ALJ described the condition of Plaintiff's right lower
extremity as a "right leg discrepancy," and discounted evidence that Plaintiff had undergone
preoperative evaluations for a below-the-knee amputation stating, "It is unclear from the record
whether surgery has been scheduled or any further follow up care has been undertaken."  AR 18.
///

Here, the ALJ's own statement acknowledges that evidence of the condition of Plaintiff's lower right extremity was incomplete or ambiguous.

In addition, the ALJ disregarded the neurological component of Plaintiff's ambulatory impairments which resulted both from Plaintiff's diabetic neuropathy and the severe injuries incurred in Plaintiff's 1985 motorcycle accident. Because minimal evidence of the interaction of these multiple impairments appears in the record, the ALJ had a duty to obtain additional evidence and expert opinion concerning the effect of these multiple impairments on Plaintiff's ability to ambulate and ultimately, to perform work. He did not do so.

Shortly before the administrative hearing, Plaintiff himself submitted evidence concerning his recent health problems. AR 732-36. At the agency hearing Plaintiff testified that he had recently begun using a walker and had spent 51 days in the hospital because he was unable to stop vomiting. AR 39-40, 45, 46-47. Unable to articulate the nature of his recent illness, Plaintiff referred the ALJ to recently submitted medical records. AR 47. Unassisted by counsel, however, Plaintiff submitted only the documentation that he had received as a patient—his discharge instructions. AR 39-40, 732-36. The ALJ took no action to supplement the record with the full records of Plaintiff's lengthy hospitalization, even though the discharge instructions include some provocative language that counsel surely would have developed further.

First, the discharge instructions report that Plaintiff had received physical therapy which "improved your physical strength and ability to walk." AR 732. The instructions directed Plaintiff to "[i]ncrease activities according to instructions from physical therapy." AR 733. The discharge instructions are incomplete and ambiguous. Their language may indicate nothing more than Plaintiff's having required therapy to restore strength after a long illness. Combined with Plaintiff's testimony that he had recently begun using a walker, which greatly improved his ability to ambulate, the ALJ erred in failing to observe his "special duty to fully and fairly develop the record and to assure that the client's interests are considered." *Brown*, 713 F.2d at 443.

Even without reference to the physical therapy note, the discharge instructions required further inquiry. Hospital stays as long as Plaintiff's (51 days) suggest serious medical issues,

which may or may not have long-term functional implications.  Plaintiff's discharge instructions do not provide sufficient information concerning Plaintiff's most recent serious illness and its implications on his ability to perform work. In addition, following the hospitalization, "There [we]re numerous changes done to [Plaintiff's] medication regiment."  AR 735.  In the absence of counsel, the ALJ had a duty to supplement the record by obtaining complete records of Plaintiff's recent hospitalization and ensuing treatment as well as medical opinions of the functional effect of Plaintiff's recent illness.

Finally, an ALJ needs to ensure that a Plaintiff's claim is protected. It appears that this was not done here.  Mr. Tackett, to whose psychological opinion the ALJ gave partial weight, opined that Plaintiff had extremely low mental processing speed and required improvement of his cognitive and perceptual skills.  However, the ALJ seemed to rush Plaintiff through a verbal waiver of Plaintiff's right to counsel, and then presented the written waiver form for signing only after the administrative hearing was completed.  AR 36-38.  The ALJ also minimized Plaintiff's disclosure that he had been unable to review the administrative record before arriving for the hearing because he was unable to follow the written instructions to view on his computer the CDs that the Commissioner has previously mailed to him.  AR 38-39.

Thus, Plaintiff's claim was not adequately protected by the ALJ, who had the duty to do so.

**VIII.   Reliability of Plaintiff's Symptom Testimony**

Plaintiff contends that the ALJ erred in rejecting Plaintiff's testimony as inconsistent with objective medical evidence and in failing to consider Plaintiff's "stellar work history."  The Commissioner counters that the ALJ's determination to discount Plaintiff's representation of the limitations associated with his physical and mental impairments was supported by clear and convincing evidence.  As detailed in subsection VII above, the ALJ chose to disregard communication difficulties associated with Plaintiff's intellectual and mental health impairments, and failed to supplement incomplete and ambiguous evidence in the record.  As a result, the ALJ's conclusion that Plaintiff's testimony was contradictory to objective medical evidence is compromised by the incomplete evidence itself.

///

## A.  <u>Stellar Work History</u>

Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016.  Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities."  S.S.R. 16-3p at 1-2.

In light of the prescribed focus on the interaction of a claimant's medically determined symptoms and his functional abilities and limitations, little would have been added by consideration of Plaintiff's "stellar work history."  In fact, the evidence of record did not establish that Plaintiff's work history was "stellar."  Nonetheless, the record suggests that Plaintiff satisfactorily performed his job as a loss prevention officer at Best Buy for many years until he clashed with a new supervisor and was fired.[15]  Whether or not one considers Plaintiff's work history to have been "stellar," the interests of justice require further discussion of the ALJ's analysis of the reliability of Plaintiff's testimony.

## B.  <u>Determining a Claimant's Reliability</u>

An ALJ is responsible for determining credibility, resolving conflicts in medical testimony and resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  His or her findings of fact must be supported by "clear and convincing evidence."  *Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014).

To determine whether the ALJ's findings are supported by sufficient evidence a court must consider the record as a whole, weighing both the evidence that supports the ALJ's determination and the evidence against it.  *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).  "[A] federal court's review of Social Security determinations is quite limited."  *Brown-Hunter v. Colvin*, 806 F.3d 487, 492 (9th Cir. 2015).  "For highly fact-intensive individualized determinations like a claimant's entitlement to disability benefits, Congress places a premium

---

[15] Plaintiff's inability to adjust easily to a new supervisor appears consist with his mental health records, which support a finding that Plaintiff is unable to adapt easily to changes in routine.

upon agency expertise, and, for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Id.* (quoting *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014), quoting *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 621 (1966)) (internal quotation marks omitted). Federal courts should generally "'leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.'" *Brown-Hunter*, 806 F.3d at 492 (quoting *Treichler.*, 775 F.3d at 1098).

A claimant's statement of pain or other symptoms is not conclusive evidence of a physical or mental impairment or disability. 42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p. "An ALJ cannot be required to believe every allegation of [disability], or else disability benefits would be available for the asking, a result plainly contrary to the [Social Security Act]." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible. *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996); S.S.R 16-3p at 3. First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281-1282. In this case, the first step is satisfied by the ALJ's finding that Plaintiff's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." AR 22. The ALJ did not find Plaintiff to be malingering.

If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities." S.S.R. 16-3p at 2. "[S]ome individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence and the same non-medical evidence." S.S.R. 16-3p at 5. In reaching a conclusion, the ALJ must examine the record as a whole, including objective medical evidence, the claimant's representations of the intensity, persistence and limiting effects of her

symptoms, statements and other information from medical providers and other third parties and any other relevant evidence included in the individual's administrative record.  S.S.R. 16-3p at 5. "The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."  SSR 16-3p at *10.

Because a "claimant's subjective statements may tell of greater limitations than can medical evidence alone," an "ALJ may not reject the claimant's statements regarding her limitations merely because they are not supported by objective evidence." *Tonapetyan*, 242 F.3d at 1147-48 (quoting *Fair*, 885 F.2d at 602 (9th Cir. 1989)).  *See also Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (holding that when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his symptoms solely because they are unsupported by medical evidence).  "Congress clearly meant that so long as the pain is *associated* with a clinically demonstrated impairment, credible pain testimony should contribute to a determination of disability." *Id.* (internal quotation.

The law does not require an ALJ simply to ignore inconsistencies between objective medical evidence and a claimant's testimony.  "While subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); SSR 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).  As part of his or her analysis of the record as a whole, an ALJ properly considers whether the objective medical evidence supports or is consistent with a claimant's pain testimony. *Id.*; 20 C.F.R. §§ 404.1529(c)(4), 416.1529(c)(4) (symptoms are determined to diminish residual functional capacity only to the extent that the alleged functional limitations and restrictions "can reasonably be accepted as consistent with the objective medical evidence and other evidence").

An ALJ therefore cannot properly assess the reliability of a claimant's testimony in light of the record as a whole when, as in this case, the medical evidence is incomplete and ambiguous.

In such circumstances, evaluating the reliability of a claimant's testimony by comparing it to the objective medical record is itself unreliable. Because the ALJ failed to take appropriate steps to ensure that the record was complete (*see* section VII above), the analysis of the reliability of Plaintiff's testimony is also incomplete.

In addition, the ALJ engaged in conclusory reasoning, taking evidence from an incomplete and complicated record to support a finding that Plaintiff was not disabled. "Although it is within the power of the Secretary to make findings concerning the credibility of a witness and to weigh conflicting evidence, *Rhodes v. Schweiker*, 660 F.2d 722, 724 (9th Cir. 1981), he cannot reach a conclusion first, then attempt to justify it by ignoring competent evidence in the record that suggests an opposite result. *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982)." *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984).

The ALJ's credibility analysis relies on his determination that the Plaintiff's testimony is inconsistent with, and unsupported by, Plaintiff's daily activities and functional abilities. Careful analysis reveals that objective evidence within the record fails to support, or directly contradicts, the ALJ's factual findings about Plaintiff activities and abilities.

The problem here is not merely an instance of an ALJ construing evidence susceptible to two reasonable interpretations. When the evidence could arguably support two interpretations, the Court may not substitute its judgment for that of the Commissioner. *Jamerson*, 112 F.3d at 1066. When the Commissioner's interpretation is not supported by substantial evidence, however, the court may set it aside. *Tackett*, 180 F.3d at 1097. Because of a lack of substantial supporting evidence, the Commissioner's findings concerning Plaintiff's daily activities and functional abilities is not supportable.

For example, the hearing decision finds that plaintiff stopped working in April 2013 "because of his conditions." AR 21. In fact, the evidence consistently indicated that Plaintiff was fired from his loss prevention position at Best Buy following a dispute with his supervisor.

In another example, the ALJ discounted evidence of Plaintiff's limited intellectual and executive management capabilities by stating:

///

21

> [O]verall the records show he continues to manage his treatment and appointments and effectively communicate concerns and complaints
>
> to providers.  Furthermore, he has been able to provide a history when needed and complete necessary paperwork.

AR 20.

To the contrary, the record shows that Plaintiff experienced substantial difficulty managing his treatment and appointments. He missed one psychiatric session because he went to the previous clinic location and was unable to locate the new VA mental health building.  AR 612.  On another occasion, Plaintiff missed multiple appointments because he had written the wrong time or date on his calendar.  AR 370, 444, 845.   VA personnel noted the need for special provisions to assist Plaintiff in keeping records and reporting to appointments.  AR 845.

Nothing in the record supports the conclusion that Plaintiff was capable of handling his own paperwork.  Plaintiff testified that he had difficulty with reading, writing, remembering, completing tasks, understanding and following instructions.  AR 42, 185.  His mother's statement and letter supported Plaintiff's testimony, adding that Plaintiff historically had difficulty taking tests, filling out forms, and easily became frustrated and angry.  AR 176-77, 206.  He did poorly in school because he could not write things on paper and had difficulty comprehending things.  AR 206.  Dr. Sethuram helped Plaintiff complete his social security disability forms.  AR 44.

Nor does the record suggest the Plaintiff has been able to "effectively communicate concerns and complaints to his providers or anyone else."  AR 20.  More than thirty years after his motorcycle accident, Plaintiff was unable to articulate what was wrong with his right leg and needed to show it to the ALJ.

Nor does the record support the conclusion that Plaintiff was capable of managing his own medical care.  The ALJ himself recognized Plaintiff's noncompliance with treatment elsewhere in the hearing decision, noting that Plaintiff often discontinued taking medication when his symptoms improved.  AR 22-23.   Plaintiff was resistant to using medication and other prescribed treatments and unable or unwilling to test his blood glucose since it required him to draw blood, which Plaintiff found painful.  Even when Plaintiff recognized that a medication was helpful, he did not consistently take it.  Plaintiff abused marijuana despite his doctors' attempts to

persuade him to discontinue its use, insisting that it relieved his symptoms better than any prescribed medication.  Such noncompliance is consistent with Plaintiff's diagnosis of bipolar disorder.  *K. Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir. 1996); *Winter v. Berryhill*, 711 Fed.Appx. 847, 851 (9th Cir. 2017).

Despite finding that Plaintiff was noncompliant with medications, the ALJ found Plaintiff's diabetes to be well managed with diet, medication and lifestyle changes.  AR 23.  Objective medical evidence contradicts this finding, never showing that Plaintiff's blood glucose and AIC test results in the normal range.  AR 250, 252, 261, 263, 331, 364, 423, 444, 647, 671, 779.  Similarly, the ALJ found that Plaintiff's diabetes caused no end organ damage and that Plaintiff had no significant problems with his vision, kidneys or hands.  AR 23.  Neurological testing revealed diabetic neuropathy sufficient to preclude a protective response to adversive stimuli to Plaintiff's toes.  AR 540.  Plaintiff 's diabetes also resulted in chronic kidney disease and diabetic retinopathy.  AR 238, 239, 322, 359, 364  Plaintiff's primary care physician, Dr. Moins, described Plaintiff's diabetes as uncontrolled.  AR 889.  Physician Mary Quann, M.D., also noted Plaintiff's poorly controlled diabetes, attributing it to his "poor understanding."  AR 371.

Minimizing the severity of the impairment of Plaintiff's right lower extremity, the ALJ found that the record revealed no muscle atrophy.  AR 23.  To the contrary, Dr. Moins noted atrophied right lower leg muscles.  AR 719.

Thus, the ALJ's conclusion that Plaintiff's testimony was unreliable is not supported by substantial evidence. On remand, the Commissioner is directed to fully review the record following supplementation to determine  Plaintiff's daily activities and functional abilities based on substantial evidence drawn from a complete record.

**IX.**     **Step Two Error**

Plaintiff contends that the ALJ erred in failing to include Plaintiff's physical impairments among the severe impairments at step two.  The Commissioner counters that because the condition of Plaintiff's right leg did not significantly limit his ability to perform basic work activities, it was not a severe impairment.  The Court disagrees with the ALJ's conclusion that

Plaintiff's lower right leg impairment was not severe because he "did not seek out or require treatment for his right leg discrepancy until 2016."  AR 19.

At step two, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments.  *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987); 20 C.F.R. §416.920(a)(4)(ii).  An impairment is a medically determinable physical or mental impairment or combination of physical or mental impairments.  20 C.F.R. § 416.902(f).  If a claimant does not have an impairment of combination of impairments that significantly limit the claimant's physical or mental ability to do basic work activities, the Commissioner will find that the claimant does not have a severe impairment.  20 C.F.R. § 416.920(c).  As noted above, the hearing decision stated that Plaintiff's severe impairments included arthritis; diabetes mellitus with neuropathy; affective disorder; and anxiety disorder.  AR 18.

### A.  The Severity Regulation Imposes a *de Minimus* Standard at Step Two

"The step-two inquiry is a de minimus screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290.  An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has no more than a minimal effect on an individual[']s ability to work."  *Id.* at 1290; SSR 85-28.  When reviewing an alleged error at step two, the Court must determine whether substantial medical evidence supported the ALJ's finding that the claimant did not have a medically severe impairment or combination of impairments.  *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005).

A post-accident impairment that results in misplacement of the claimant's foot, an ankle and lower leg deformity, a stepping gait that cannot be minimized through application of a brace, fragile scar tissue that is easily wounded, and postural changes that result in arthritic pain of the claimant's hips and other leg is not so minimal in nature that it could never prevent a person from working.  The Court notes that the ALJ also omitted other physical impairments that arguably should have been included as severe impairments: diabetic retinopathy, chronic renal disease, shoulder joint pain, chronic gastrointestinal problems, allergic rhinitis and sinusitis and substance abuse (marijuana), and minimized Plaintiff's diagnosed bipolar disorder with psychotic features (*see* AR 432-33, 536) by calling it an "affective disorder."

## B.    ALJ Must Consider Combined Effect of Multiple Impairments

Even if an individual impairment is not sufficiently serious to prevent a person from working, an ALJ must consider the combined effect of all of the claimant's impairments on his or her ability to function as well as considering the claimant's subjective symptoms, such as pain or fatigue. *Smolen*, 80 F.3d at 1290. "If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process." SSR 85-28. The *Smolen* court warned:

> Great care should be exercised in applying the not severe impairment concept. If an adjudicator is unable to determine clearly the effect of an impairment or combination of impairments on the individual's abilities to do basic work activities, the sequential evaluation process should not end with the not severe evaluation step. Rather, it should be continued. In such a circumstance, it the impairment does not meet or equal the severity level of the relevant medical listing, sequential evaluation requires that the adjudicator evaluate the individual's ability to do past work, or to do other work based on the consideration of age, education, and prior work experience.

SSR 85-28.

For example, Ms. Smolen had survived childhood cancer that resulted in the loss of one kidney, loss of part of her left lung, changes in her remaining lung tissue, mild anemia, suppression of bone marrow production, and spinal scoliosis, all of which led to severe fatigue and back pain. *Smolen*, 80 F.3d at 1290. The ALJ found only a single severe impairment, "slight scoliosis," which limited her ability to walk and sit. *Id.* The step two analysis disregarded Ms. Smolen's subjective symptoms when determining severity. *Id.* The Ninth Circuit rejected the step two analysis: "Having found Smolen to suffer from only one "severe" impairment at step two, the ALJ necessarily failed to consider at step five how the combination of her other impairments—and resulting incapacitating fatigue—affected her residual functional capacity to do work." *Id.* at 1291. Similarly, characterizing many of Plaintiff's impairments as not severe at step two resulted in the impairments' omission from consideration at subsequent steps of the disability analysis.

///

///

## C.    The ALJ Misconstrued the Evidence of Plaintiff's Leg Deformity

The ALJ concluded that Plaintiff's "right leg discrepancy" was not a severe medically determinable impairment:

> [T]he evidence in the record shows that claimant did not seek out or require treatment for his right leg discrepancy until 2016. Moreover, his examinations were unremarkable as they relate to this condition, of the right lower extremity. The evidence does not indicate his activities were limited by providers and in fact he was often advised to increase his physical activity.

AR 19.

As noted in section VII, the ALJ failed to ensure that the medical record included complete and accurate evidence of Plaintiff's impairments, particularly the condition of Plaintiff's lower right extremity. Even in its incomplete state, the record contradicts the ALJ's determination. Plaintiff was seriously injured in a motorcycle accident in 1985, requiring surgery to save his lower right leg that included the removal of his fibula.[16] AR 682. Plaintiff experienced chronic pain and had significant scar tissue that bled easily. AR 682. Dr. Brownell was unable to stabilize Plaintiff's lower right extremity because the presence of extensive and fragile scar tissue precluded the use of an ankle foot orthosis. AR 538. Plaintiff told Dr. White that in retrospect he wished his leg had been amputated at the time of the surgery. AR 682-83. At the agency hearing Plaintiff was unable to articulate the nature of his injury and raise his pant leg to show the ALJ the condition of his leg. AR 45. The ALJ did not memorialize what he observed for the record.

In addition, the record establishes neurological deficits reflecting Plaintiff's diabetic neuropathy (testing revealed no protective response in Plaintiff's toes (AR 540)) as well as sensory deficits linked to Plaintiff's 1985 motorcycle accident (Plaintiff testified that there was so much nerve damage, his leg did not hurt (AR50)). The ALJ did not acknowledge the neurological component of Plaintiff's lower right extremity impairment.

///

///

---

[16] The fibula is the outer and smaller of the two bones in the lower leg, which articulates proximally with the tibia and distally is joined to the tibia by syndesmosis. *Dorland's Medical Dictionary* at 629 (28th ed. 1994).

## D.    The ALJ's Errors Were Not Harmless

The ALJ erred at step two by disregarding the severity rule and concluding that Plaintiff's foot, ankle and lower leg deformity was not a severe impairment; failing to consider Plaintiff's diabetic retinopathy, chronic renal disease, shoulder joint pain, chronic gastrointestinal problems, allergic rhinitis and sinusitis and substance abuse (marijuana) in the context of the step two analysis; and, minimizing Plaintiff's diagnosed bipolar disorder with psychotic features (*see* AR 432-33, 536) by calling it an "affective disorder." These errors cannot be considered harmless. As in *Smolen*, the omission of the full panoply of Plaintiff's impairments resulted in the ALJ's failing to determine accurately Plaintiff's residual functional capacity in light of his combined impairments. As part of the analysis of Plaintiff's claim on remand, the Commissioner is directed to use the augmented medical records to ensure that all severe impairments are included at step two, and that the combined effect of all severe impairments are fully considered.

## X.    Improper Analysis of Expert Medical Opinion

Plaintiff challenges the Commissioner's determination of his residual functional capacity, contending that the ALJ erred in rejecting the opinions of treating physician Karthik Sethuram, M.D. The Commissioner disagrees, contending that the ALJ properly rejected Dr. Sethuram's opinion as inconsistent with the objective evidence.

As discussed in detail in section VIII above, the ALJ made many factual findings that were not supported by substantial evidence. The ALJ erred in using these unsupported findings to set aside Dr. Sethuram's opinions.

## A.    Applicable Law

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in disability determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen*, 80 F.3d at 1285. The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only

for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast, a contradicted opinion of a treating professional may be rejected for "specific and legitimate" reasons. *Id.* at 830. However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

## B.  Dr. Sethuram's Opinion

Scattered throughout the record are four pages of a report prepared by Plaintiff's VA treating psychiatrist, Karthik Sethuram, D.O. AR 408-10, 537. Dr. Sethuram opined that Plaintiff had a mild intellectual disability. AR 408. Plaintiff was likely to be off-task from 15 to 20 percent of the workday, miss one day of work each month, and be unable to complete a full day of work twice monthly. AR 409. About five percent of the time, Plaintiff would be unable to sustain an ordinary routine without special supervision; make simple work-related decisions; complete a normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and, be aware of normal hazards and take appropriate precautions. AR 409-10, 537. About ten percent of the time, Plaintiff would be unable to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods of time; work in coordination with or in proximity to others without being distracted by them; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and, set realistic goals or make plans independently of others. AR 408-09, 537. About fifteen per cent of the time, Plaintiff would be unable to travel in unfamiliar places or use public transportation. AR 409, 537.

Dr. Sethuram believed that because of his medical impairments and physical and mental limitations, Plaintiff was unlikely to obtain and retain full-time work in a competitive work setting for a continuous period of more than six months:

///

[Patient] is currently in treatment with me in mental health clinic. He has not been compliant with meds in the past, but has been taking for the last 12 days (as of 07/30/2014). He has held jobs before, but due to the level of mental illness and med regimen he is currently on, he may be unable to sustain a full workday. May be able to follow routine, manual jobs with simple instructions, but would have difficulty in competitive, fast moving, or complicated jobs that require a great deal of social contact.

AR 408.

### C.     The ALJ's Analysis

The ALJ gave little weight to the opinion of treating physician Dr. Sethuram finding that the doctor's opinions concerning Plaintiff's likely inability to obtain and retain work were inconsistent with the evidence of record. AR 24-25. The ALJ emphasized that despite periodic exacerbations of Plaintiff's mental health impairments, Plaintiff was able to perform activities of daily living and manage his finances and treatment. AR 25. In addition, Dr. Sethuram did not clearly indicate whether his opinion was intended as a long-term assessment of Plaintiff's functioning. AR 25. The ALJ concluded that Dr. Sethuram's statements indicated that Plaintiff would improve with medication and treatment compliance. AR 25.

### D.     The ALJ's Rejection of Dr. Sethuram's Opinion

The Commissioner must give more weight to medical opinions from a claimant's treating sources since treating professionals are most able to provide a detailed, longitudinal picture of the claimant's medical impairments and may provide a unique perspective to the medical evidence that cannot be drawn from objective medical findings along or from reports of individual examinations. 20 C.F.R. § 404.1527(c)(2). "The Commissioner is required to give weight not only to the treating physician's clinical findings and interpretation of test results, but also to his subjective judgments." *Lester*, 81 F.3d at 833. The ALJ did not acknowledge Dr. Sethuram's status as a treating physician.

Here, the ALJ focused on the supportability of Dr. Sethuram's opinion (20 C.F.R. § 404.1527(c)(3)), finding that the opinion was not consistent with the evidence of record. As discussed in section VIII above, however, the ALJ's findings concerning Plaintiff's daily activities and functional abilities were not supported by substantial evidence in the administrative

record. As a result, the ALJ erred in concluding that that Dr. Sethuram's opinions were not supportable.

Further, an ALJ may not reject an expert medical opinion because a claimant occasionally experiences periods of relief from his symptoms and an increased ability to function. *Lester*, 81 F.3d at 833. "Occasional symptom-free periods—and even the sporadic ability to work—are not inconsistent with disability." *Id.*

Interestingly, the ALJ did not give limited weight to Dr. Sethuram's opinion because of a contradictory medical opinion. Rather the ALJ gave it limited weight because it was inconsistent with the ALJ's own assessment of Plaintiff's daily activities and functional abilities. "[A]n ALJ may not act as his own medical expert as he is "simply not qualified to interpret raw medical data in functional terms." *H. Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999). Decisions addressing this issue frequently speak of an ALJ's "play[ing] doctor and making [his] own independent medical findings." *See, e.g., Banks v. Barnhart*, 434 F.Supp.2d 800, 805 (C.D. Cal. 2006). *See, e.g., Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) (ALJ erred in rejecting medical opinion based on the ALJ's belief that claimant's attempts to operate a small business were inconsistent with a diagnosis of major depression). Thus, despite the lack of evidentiary basis, the ALJ concluded that Dr. Sethuram's statements indicated that Plaintiff would improve with medication and treatment compliance. However, Dr. Sethuram's opinion does not go that far.

Further, it is "a questionable practice to chastise one with a mental impairment for exercise of poor judgment in seeking rehabilitation." *K. Nguyen*, 100 F.3d at 1465 (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989). Courts within the Ninth Circuit generally recognize that noncompliance with treatment is consistent with a diagnosis of bipolar disorder and does not undermine the claimant's level of disability. *Winter*, 711 Fed.Appx. at 4. Failure to comply fully with treatment is "entirely consistent" with diagnoses including bipolar disorder, depression and anxiety. *Brewes v. Comm'r of Soc. Sec.*, 682 F.3d 1157, 1164 (9th Cir. 2012).

The ALJ erred in giving little weight to Dr. Sethuram's opinion.

///

**XI.** **Remand for Further Proceedings**

When the Commissioner's decision is not supported by substantial evidence, the Court has the authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *McCartey v. Massanari*, 298 F.3d 1072, 1076 (9th Cir. 2002). "Generally when a court . . . reverses an administrative determination, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); *Moisa v. Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004). Here, remand is appropriate so that the Commissioner may supplement the record to include evidence fully and unambiguously addressing all of Plaintiff's mental and physical impairments and obtain medical opinions assessing the effect of Plaintiff's impairments on his residual functional capacity. To ensure the appearance of fairness, the Court encourages the Commissioner to delegate his responsibilities to an administrative law judge who has not previously considered Plaintiff's application.

**XII.** **Conclusion and Order**

It is hereby ordered that this case be REVERSED and REMANDED to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings in accordance with this opinion. The Clerk of Court is directed to enter judgment in favor of Plaintiff, Mark Allan Keeler, and against Defendant, Andrew Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated: __**September 30, 2019**__ _____**/s/ Gary S. Austin**__
                                    UNITED STATES MAGISTRATE JUDGE

31